# IN THE UNITED STATED DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. <u>1:22-CV-00049 PAB-SKC</u>

ANDRE BELLECOURT
Plaintiff,

v.

INDIAN HARBOR INSURANCE COMPANY; CONSTITUTION STATE SERVICE, LLC AND JANECIA WILLIS

---

## PLAINTIFF'S EXPERT DISCLOSURE

---

      **COMES NOW,** the Plaintiff, Andre Bellecourt, (hereinafter "PLAINTIFF") by and through his attorneys, HEUSER & HEUSER, LLP, and for his Expert Disclosures, states the following:

### F.R.C.P. 26(a)(2)(B) EXPERTS

1.     Stephen H. Shogan
            6087 South Quebec Street, Suite 200
            Centennial, CO 80111

      Dr. Shogan will testify that he is a neurosurgeon who is licensed to practice medicine in the state of Colorado. His primary focus is on treating patients with spinal cord injuries and other spinal related issues. A copy of Dr. Shogan's CV, testimony history and report of his findings are attached hereto and incorporated herein. The material Dr. Shogan reviewed to help reach his conclusions will be burned onto a disc and sent in the mail to opposing counsel and or can be found at this link:

https://us.workplace.datto.com/filelink/633ba-4f7bf6c9-08df6f1446-2

Dr. Shogan is expected to testify that he conducted a physical examination of Andre Bellecourt on December 8, 2022 at the request of Mr. Bellecourt's attorneys. He will also testify that he reviewed and considered the medical records that were provided to him. It is expected that Dr. Shogan will testify consistently with his report that is provided herein.

Dr. Shogan will testify that the Plaintiff's diagnosis is severe low back pain with associated lower extremity weakness and left leg pain and numbness due to degenerative disease and musculoskeletal pain. His symptoms are also due to worsening following his lumbar fusion.

Dr Shogan is expected to testify that in his opinion it is quite difficult to make an accurate apportionment of Mr. Bellecourt's injuries. It is noted that he was experiencing pain in his low back region and left leg numbness prior to his motor vehicle accident in this case and that his symptoms clearly increased following accident, but the greatest portion of his symptoms have increased since his lumbar fusion surgery. Dr. Shogan will opine that overall, approximately two-thirds of his current symptoms are new since his motor vehicle accident of November 23, 2018.

Dr. Shogan will provide testimony that the Plaintiff's prognosis is guarded and that it is unclear as to what future symptoms will look like since he has not reached maximum medical improvement and may require future treatment. Dr. Shogan will opine that Mr. Bellecourt has clearly sustained some temporary impairment following his November 23, 2018, motor vehicle accident. His walking ability has been impaired, and his symptoms clearly have increased so that it is impossible at this time to state if this will represent permanent impairment. He will also opine that he believes further treatment should be undertaken.

As to whether Mr. Bellecourt's treatment was reasonable and accident related, Dr. Shogan

will provide testimony that Dr. Barker's surgery was within the standard of medical care, but that Mr. Bellecourt was given an inadequate trial of conservative treatment. He will also indicate it is uncertain as to whether he required as extensive an intervention as was performed but that all other medical treatment has been reasonable and necessary, and all of his treatment has been related to Mr. Bellecourt's motor vehicle accident of November 23, 2018.

Dr. Shogan will testify that he believes that Mr. Bellecourt would benefit from future care. He recommends that he be evaluated, both by a spine surgeon, and that he be evaluated by a physical medicine and rehabilitation specialist. A treatment program of rehabilitation can then be outlined for Mr. Bellecourt. He has not received as extensive a rehabilitation program as may be necessary for him. This was partially secondary to the COVID pandemic. He will testify that note is made that Dr. Barker has recommended further surgery for Mr. Bellecourt. Evaluation regarding this by a spine surgeon would be appropriate at this time. This may include further diagnostic studies.

Dr. Shogan will testify that he does not believe that Mr. Bellecourt is at maximum medical improvement and that he requires further evaluation and possible further rehabilitative treatment. He will also opine that it is not known whether Mr. Bellecourt suffers any permanent restrictions. This is do to the fact that he needs further treatment and has reached maximum medical improvement.

Dr. Shogan may provide rebuttal opinions and will also testify in accordance with any depositions that may be taken in the future.

    2.    Mark Guilford

         Accumed

         23 Inverness Way East, #102

         Englewood, CO 80112

Mark Guilford is a finance and data analysis professional with extensive experience in statistical analysis and data transparency. His CV is attached hereto.

Mr. Guilford will testify that he analyzed the reasonableness of billed charges for the medical bills received by Andre Bellecourt as compared to other similar providers and reported his findings in the report included with this disclosure. The reasonable value of Mr. Bellecourt's bills was given in the vicinity of Aurora, CO as identified on page two of the report. In compiling the information contained in his report, he reviewed medical bills from treating providers. A summary of these providers, including the names of the providers, the total billed charges, and the reasonable value can be found on page two of his report. This summarizes the bills – with billed charges totaling $607,199.69 – and will be used as an exhibit for his testimony. This report relies on the medical billing and procedural codes that appear on the medical bills. This provides historical billing charges from providers contained in the databases of the same or similar procedures.

Bills from six providers were not analyzed due to insufficient data. The charges of these bills total $57,973.88. The providers are shown on page two of the report attached hereto. When additional information becomes available, Mr. Gulliford will update his analysis and opinions, if necessary.

Mr. Gulliford's independent analysis of Andre Bellecourt's medical bills arrived at a reasonable value in amount charged of $549,863 compared to the actual bills analyzed totaling $549,225.81 ($607,199.69 minus $57,973.88 not analyzed). It was therefore his opinion that the bills that were analyzed that totaled $549,225.81 are reasonable.

Mr. Gulliford was also asked to assess the reasonable value of Mr. Bellecourt's future care. The included report titled Expert Medical Cost Projection – Estimate of Reasonable Value of Future Medical Care provides a full estimate of the reasonable value of billed charges for a one-level lumbar anterior and posterior pseudoarthrosis revision at L5 – S1 as referenced by John Barker, MD in the records dated May 20, 2020. The analysis assumes the procedure would be done in the vicinity of Aurora, CO. The report and opinion rely on Dr. Barker's recommendation to pull historical billed charges from the databases of the same or similar procedures as well as determine the billing codes and associated charges of other medical services that would likely be provided at the time of the treatment.

Mr. Gulliford will testify as set forth in detail by his independent analysis in Exhibit E. He will set out his opinion regarding the reasonable value of billed charges for a one-level lumbar anterior and posterior pseudoarthrosis revision at L5 – S1 in the vicinity of Aurora, Colorado. The total amount of expenses related to that surgery would be in the vicinity of $405,341.00.

    3.    Sherry Young, OTR
           Starting Point Rehabilitation
           5255 Marshall Street, #120
           Aravada, CO 80002

Sherry Young has been an occupational therapist for thirty years with experience in occupational rehabilitation and treatment of chronic pain and post-concussive syndrome. Her CV, fee schedule and trial testimony are attached hereto.

Ms. Young will testify that on November 23, 2018, Mr. Bellecourt was taking a Lyft home and before he was able to get his seatbelt on, another vehicle rearended the Lyft vehicle. On impact he was projected from the back of the vehicle into the front seat. He reported that he felt as if his spine had exploded. He was seen in the emergency room and a physician's office the next day. Following conservative treatment, he had a transforaminal lumbar interbody fusion.

Ms. Young will testify that the purpose of this Functional Capacity Evaluation (FCE) was to assess the physical abilities and limitations resulting from the incident just described and their effects on Mr. Bellecourt's ability to perform "Activities of Daily Living" (ADLs) as well as work functions. At the time of the accident, Mr. Bellecourt was working full-time as an account manager for Sprint and had worked there for 15 years.

Ms. Young will opine based on widely accepted protocols within the field of FCEs, it was determined that Mr. Bellecourt was most certainly putting forth full and consistent effort throughout this evaluation. 20 out of 20 markers used to determine the level of effort indicated that high effort was put forth. The consistency of isometric force readings, clinical observation, as well as the congruency between known medical diagnoses and observed behaviors, all indicate that Mr. Bellecourt was putting forth full effort and that this FCE can be considered a valid representation of his functional limitations and abilities. Specific findings in this regard are outlined in more detail later

in this report. See **Appendix A**.

2. Based on widely accepted protocols, 4 out of 4 markers used to evaluate the presence of symptom exaggeration indicated a total lack of exaggeration. Stated pain levels during activities changed appropriately based on the difficulty level and remained consistent with demonstrated pain behaviors. Responses on various subjective functional questionnaires were also very consistent with observed limitations. In this case, observations and known functional deficits associated with failed spinal fusions support the fact that Mr. Bellecourt's report of abilities and limitations can be considered valid and authentic. See **Appendix B**.

3. Mr. Bellecourt demonstrated the ability to safely lift 10 pounds from knee height, 10 pounds from waist to shoulder, and 10 pounds overhead on an "occasional" basis. He was unable to lift any item/weight from the floor due to the inability to bend, squat, or crouch low enough to reach the box. Mr. Bellecourt was unstable when lifting with both hands, and when not allowed the ability to stabilize himself with one hand on a sturdy surface. He would not be able to consistently lift over an 8-hour workday. While Mr. Bellecourt may be able to lift more weight in isolated instances, it would be at the cost of elevated symptoms that would impact functional abilities during subsequent activities. See **Appendix D**.

4. Positional tolerances were poor throughout the FCE. As with most people experiencing chronic spinal pain, tolerances fluctuate from day to day and hour to hour depending on tasks performed. Sitting can be performed on a frequent to constant basis in 30-60-minute increments (on average). Standing can be performed on an occasional basis in 5-minute increments (on average). Walking can be performed on an occasional

basis in 5-10-minute increments (on average). Mr. Bellecourt spent 41 minutes "resting" and not being productive during this FCE which lasted 3.5 hours in increments of 3-11 minutes. Mr. Bellecourt was very uncomfortable after his one-hour Uber ride upon arrival and he needed to lie down on his side to reduce pain enough to engage in testing procedures. See Appendix E and "Testing Procedures in Sequence."

5. Mr. Bellecourt was unable to safely squat, bend, or crouch during the FCE. He demonstrated protective patterns, to keep his spine as neutral as possible. Any kind of trunk rotation or forward lean increased reported pain and observable pain behaviors. He relied heavily on his 4-wheeled walker to move about the clinic and did not abandon it as some people do, indoors.

6. Mr. Bellecourt's balance was tested. He is at high risk for falls, even with the use of his 4-wheeled walker. This creates a liability issue in any work environment. See **Appendix C**.

7. Mr. Bellecourt was unable to work, even in a sedentary fashion, for more than 1 hour and 20 minutes maximum. Other work intervals were much shorter. Requiring frequent breaks in the workplace decreases productivity which impedes the ability to compete with others applying for the same position.

8. Mr. Bellecourt reported cognitive problems since the Uber collision. He demonstrated memory problems during the FCE which is consistent with his report of cognitive difficulties. Chronic pain and the use of pain medications commonly interfere with cognitive abilities. Mr. Bellecourt took Oxycontin during the evaluation which would indeed impact his cognitive abilities. (Orla Moriarty, Brian E. McGuire, David P. Finn. The effect of pain on cognitive function: A review of clinical and preclinical

research. Progress in Neurobiology. 2011; 93; pages 385-404.)

9. Mr. Bellecourt requires high levels of assistance from others such as his roommates to help him. If he was living alone, he would require assistance with all house chores, yard maintenance, etc. His poor balance and inability to bend, reach (uses a reacher at home), squat, or crouch prohibit him from caring for his home and yard.

10. Mr. Bellecourt reports a history of surgery for spinal stenosis 10-20 years ago but that he was able to walk with a cane quite well up until the injury event. He also has a history of gout that is controlled with medication. He was not having a gout flare-up at the time of the FCE.

Ms. Young will opine based on Mr. Bellecourt's demonstrated physical impairments alone, he is not employable and is unable to meet employment standards in terms of safety, reliability, dependability, and accuracy, even on a part-time basis. He struggles just to care for himself and relies on the help of others in the home setting. Mr. Bellecourt is not employable based on this evaluation. There were no indications of lack of effort or symptom exaggeration, therefore, the results of this FCE are considered valid.

This FCE was performed by Sherry Young, OTR, and Madaline Spoden, COTA. Sherry Young, OTR generated all conclusions, opinions, and recommendations.

## F.R.C.P. 26(a)(2)(C) EXPERTS

4. John Rives Barker M.D.

    Rocky Mountain Spine Clinic

    10103 Ridge Gate Parkway

    Suite 306

    Lone Tree, CO 80124

John Rives Barker is an orthopedic spine surgery specialist.  He will testify to his medical records and the medical treatment he provided to Mr. Andre Bellecourt.

Dr. Barker will testify consistently with the medical records that have been previously disclosed.  Dr. Barker did not provide a narrative report, but did respond to questions provided to him by the Plaintiff's attorney.

Dr. Barker will testify that Mr. Bellecourt was a pleasant 57-year-old male who presented in his office for another opinion, He had a history of back pain. He has had back pain and leg pain for quite a while. He had a previous lumbar L3-S 1 laminectomy performed by Dr. Jeffery Kleiner' in approximately 2006. He was still able to do normal activities of daily living. On November 21, 2018, the patient was getting into a Lyft and the car was rear-ended before the patient had a chance to buckle his seatbelt. Thus, he was an unrestrained rear seat passenger in a rear end collision. Since the collision, the patient has had a drastic increase in his symptoms. He now has severe neurogenic claudication and can only walk for about 15, minutes before he had to stop and sit down. He has also noticed weakness in his legs that was

not present before the motor vehicle accident, The patient was having a lot of trouble doing activities of daily living, Since the accident, he has had some lumbar physical therapy.  Current medications included gabapentin and tramadol. He has also been using CBD oil. He saw Dr. Ibraheim who ordered a lumbar epidural steroid injection. Unfortunately, the epidural steroid injection did not give him any significant relief, The patient has also noticed some bladder incontinence which he did not have prior to the motor vehicle accident.

Dr. Barker will testify regarding all aspects of the surgery he performed on May 9, 2019.  His records note:

Preoperative Diagnoses:

1. Lumbar stenosis L3-4, L4-5, L5-S1

2. Lumbar spondylolisthesis

3. Lumbar degenerative disk disease

4. Lumbar spondylosis

 Postoperative Diagnoses

1. Lumbar stenosis L3-4, L4-5, L5-S1

2. Lumbar spondylolisthesis

3. Lumbar degenerative disk disease

4. Lumbar spondylosis

Procedures performed

1.  Transforaminal Lumbar Interbody fusion L3-4, L4-5 and L5-S1

2.  Posterolateral arthrodesis L3-4, L4-5 and L5-S1

3.  Laminectomy with complete facetectomies bilaterally at L3-4, L4-5 and L5-S1

    4. Placement of segmental instrumentation, L3-S1

    5.  Placement of interbody fusion case, L3-4, L4-5 and L5-S1

    6.  Aspiration of bone marrow

    7.  Harvesting of local bone graft from spinous process and laminar fragments

Dr. Barker will testify that he saw Mr. Bellecourt on May 20, 2020.  His records indicated that his physical exam showed that the patient has an antalgic gait, favored his left side and ambulated with a cane. He has 5/5 EHL, ankle dorsiflexion, ankle plantarflexion, knee flexion and knee extension bilaterally.   His records indicate that x-rays, a CT scan of his lumbar spine was reviewed from health images. He has screws from L3-Sl. Unfortunately, he had lucency around his Sl screws consistent with a pseudoarthrosis. He also had some vacuum phenomenon in his LS-S1 level. The L3-4 and IA-5 levels appear to be healed.  Dr. Barker will testify that he talked to Mr. Bellecourt about the CT findings.  Dr. Barker will testify that Mr. Bellecourt was told that he has a nonunion at L5-S 1 and that is why he has continued pain in his lumbar spine and his legs. He will testify that Mr. Bellecourt needs an anterior and posterior LS-S1 pseudoarthrosis revision and that the patient would think about his options and contact the doctor if he wanted to proceed with a pseudoarthrosis repair. Dr. Barker was asked the following questions and the answers to these questions are as follows:

1.     *Diagnosis*;  15 months s/p TLIF L3-S1 pseudoarthrosis
2.     *Prognosis*;  fair
3.     *Etiology;*  lumbar spine
4.     *Will future care be needed?  If so, how long and at what approximate costs*?
        Yes, unsure at this point.

5. *Will future surgery be needed? If so, when and to what extent and at what approximate costs?* Yes, when patient is ready to schedule

6. *Is Mr. Bellecourt at maximum medical improvement?* No

    If not, when do you anticipate maximum medical improvement? Unknown

7. *Permanent physical restrictions*; no lifting over 15 pounds

8. *Does Mr. Bellecourt have any permanent impairment? If so, is it mild, moderate, or severe?* moderate

## CERTIFICATION

I hereby certify that to the best of my knowledge, information, and belief, formed after reasonable inquiry, that the above Plaintiff's Expert Disclosure is complete and correct as of the date set forth below.

DATED THIS 14th day of December, 2022.

>Heuser & Heuser, LLP
>
>
>Original duly signed and on file at
>Heuser & Heuser, LLP
>
>
> /s/   Douglas P. Price
>Douglas P. Price, Esq.
>Attorney for Plaintiff

## CERTIFICATE OF MAILING

I hereby certify that on this 14th day of December, 2022 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following email addresses:

**Ryan C. Gill**                                                                             VIA CM/ECF
Lewis Brisbois Bisgaard & Smith LLP
Direct: 720-292-2021
Email: Ryan.Gill@lewisbrisbois.com

*Duly signed original on file at Heuser & Heuser LLP*

/s/     Lori Baumert